RECEIVED

JUN 0 6 2013

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT, LOUISIANA

BY: _____

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

BRIDGER LAKE, LLC

versus

SENECA INSURANCE COMPANY, INC.

CIVIL ACTION NO. 11-0342

JUDGE TOM STAGG

## MEMORANDUM RULING

The issues to be decided in this case concern the proper interpretation of the provisions of a Pollution Exclusion endorsement contained within a Commercial General Liability Policy. The policy was issued by the defendant, Seneca Insurance Company ("Seneca") to the plaintiff, Bridger Lake, LLC ("Bridger"), to cover the operations of Bridger's crude oil pipeline ("the pipeline").

Three motions are pending before the court. First is a motion for summary judgment filed by Seneca. See Record Document 26. Second is a motion for partial summary judgment filed by the plaintiff Bridger. See Record Document 27. Third is Seneca's motion to strike two expert reports submitted by Bridger in support of its motion for summary judgment. See Record Document 30. For the reasons set forth below, Seneca's motion for summary judgment is **GRANTED**, Bridger's motion for partial summary judgment is **DENIED**, and Seneca's motion to strike is **DENIED AS**

**MOOT**.

## I. BACKGROUND

Bridger owns and operates a twenty-seven mile long underground crude oil pipeline built to transport production from wells in Northwestern Utah to a storage tank near Robertson, Wyoming.[1] Whiting Oil & Gas Corporation ("Whiting") uses the pipeline to transport oil across the state line and into Bridger's storage tank. On April 1, 2010, the Thursday before Easter, the pipeline ruptured at milepost 16.5, releasing approximately 2,754 barrels of crude oil into the environment. See Record Document 26, Ex. B at 82, 110. However, Bridger's employee, Dave Baer ("Baer"), did not notify Whiting's employees of the rupture until April 6, 2010.[2]

---

[1] The pipeline is six inches in diameter and "starts at the Whiting Petroleum Facility in the Wasatch National Forest in Summit County, Utah." Record Document 26, Ex. B at 47. From there, the pipeline "runs north approximately three miles and uphill for 500 feet in elevation, and then downhill 2,000 feet in elevation, for an additional 24 miles. Id., Ex. B at 47. "The line ends at 25,000-barrel breakout tank just north of I-80." Id., Ex. B at 48. There are "three production injection points on the line. The first is at the beginning of the line, and there are two additional injection points near the high point of the six-inch line." Id., Ex. B at 48. "The production company sells the crude oil to Shell at Lease Automatic Custody Transfer – or LACT – units and the oil is pumped through a few miles of 3.5-inch gathering lines to the six-inch Bridger Lake Trunk Line." Id., Ex. B at 49. When full, the pipeline held 5,400 barrels of oil.

[2] Baer managed the pipeline's operations for thirty years. See Record Document 26, Ex. B at 8, 15-16. Customarily, Baer would close the tank injection valve on the last day of the month and shut off the mixer in the tank so that the contents would "settle" overnight. See id., Ex. B at 50-52. On the morning of the

See id., Ex. C at 23-24.  Without notice of any problem with the pipeline, Whiting's

employees continued to pump oil into the pipeline throughout Easter weekend (April

2nd, 3rd, 4th, and 5th), causing an additional 1,500 barrels of crude oil to escape

through the same rupture point until Bridger ultimately shut the pipeline down on

April 5, 2010.  See id., Ex. C at 20.   Bridger claims it has spent at least

$4,798,296.30 to remediate the land and groundwater surrounding the rupture site in

order to comply with state and federal environmental regulations.  See Record

Document 27, Ex. A.

At the time of the rupture, the pipeline was insured by a CGL policy issued by

Seneca with a $1,000,000 occurrence limit and bearing policy number ESR 0005837

("the policy").[3]  The policy provided three types of coverage: (1) Coverage A for

bodily injury and property damage liability; (2) Coverage B for personal and

advertising injury liability; and (3) Coverage C for medical payments.  See Record

---

first day of the month, Baer would check all of the gauges and climb the tank's
stairs to measure the level of oil in the tank. See id., Ex. B at 79-81.
    Although neither Bridger nor Seneca explicitly identified the cause of the
spill, investigations indicate that oil was pumped into the line from the production
facility while the valve was closed for measurement, resulting in over-
pressurization. See id., Ex. A, 74-75; Ex. D at 68-70.

    [3] In addition to its policy with Seneca, Bridger's pipeline was insured by a
policy issued by American International Special Lines Insurance Company
("AIS").  AIS provided coverage for all of the damages except for the first
$1,000,000 in costs.

Document 26, Ex. E-1.  Most relevant, and hotly contested in this litigation, is the policy's exclusion for damage caused by pollution and an exception to the pollution exclusion for a "short-term pollution event."  See id.

Bridger reported the rupture to its insurance broker, Sloan Mason, who forwarded a Notice of Occurrence to Seneca on April 8, 2010.  See Record Document 27, Ex. A.  On May 4, 2010, upon notice of sums spent in remediation, Seneca advanced $100,000 to Bridger but reserved its rights to deny coverage and seek reimbursement of the payment if Seneca later determined no coverage was due under the policy.

On March 2, 2011, Bridger filed suit in this court seeking the remaining $900,000 in coverage from Seneca under the policy.  See Record Document 1. Bridger also alleges that Seneca acted arbitrarily and capriciously in adjusting its claim and seeks damages, penalties, attorney's fees and costs pursuant to Louisiana Revised Statutes 22:1892 and 22:1973.[4]  See id.  Seneca answered and filed a counter-claim, which seeks return of the $100,000 it paid Bridger.  See Record Document 7.

Seneca filed a motion for summary judgment seeking dismissal of Bridger's

---

[4] Louisiana Revised Statutes sections 22:1892 and 22:1973 were renumbered from 22:658 and 22:1220, respectively, in 2008. See 2008 La. Acts. No. 415, § 1.

claims on the grounds that the pollution exclusion clause in its insurance policy issued to Bridger excludes coverage of Bridger's damages. See Record Document 26. In turn, Bridger filed a motion for partial summary judgment which seeks a determination that coverage is due because the rupture qualifies as a "short-term pollution event" and thus falls within the exception to the policy's pollution exclusion. See Record Document 27. Seneca opposed the motion and filed a motion to strike two expert reports submitted as exhibits to Bridger's motion for partial summary judgment. See Record Documents 29 and 30.

## II. LAW AND ANALYSIS

**A.    Summary Judgment.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004). If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must

go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." <u>Gen. Universal Sys., Inc. v. Lee</u>, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. <u>See</u> <u>Boudreaux v. Swift Transp. Co.</u>, 402 F.3d 536, 540 (5th Cir. 2005). The Fifth Circuit has cautioned that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy" the nonmovant's burden in a motion for summary judgment. <u>Ramsey v. Henderson</u>, 286 F.3d 264, 269 (5th Cir. 2002).

**B.    Conflict Of Laws.**

The first task for the court to determine is which state's law governs interpretation of the policy. Seneca argues Wyoming's law should govern, while Bridger maintains that Louisiana's law should control. Because the court's subject matter jurisdiction in this matter rests on diversity of citizenship pursuant to 28 U.S.C. § 1332, the court must apply the forum state's choice of law principles. <u>See</u> <u>Klaxon Co. v. Stentor Elec. Mfg. Co.</u>, 313 U.S. 487, 497, 61 S. Ct. 1020, 1022 (1941); <u>Roberts v. Energy Dev. Corp.</u>, 104 F.3d 782, 786 (5th Cir. 1997). Accordingly, this court will apply Louisiana's choice of law principles.

Both parties rely on Louisiana Civil Code article 3537, which provides that,

with respect to issues of conventional obligations, the governing state's law is determined by considering "(1) the pertinent contacts of each state to the parties and the transaction, including the . . . domicile . . . of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515. . . ." La. Civ. Code art. 3537.  Bridger and Seneca fiercely dispute a number of factors listed in article 3537, particularly the location of Bridger's domicile.

Locating Bridger's domicile is unnecessary because article 3537 is not determinative in this case.  Comment (a) makes clear that the article is residual in nature and only applies in the absence of a more specific codal provision.  See id., cmt. (a) ("[T]his Article will be superseded by the more specific articles [such as Article 3540]").  A more specific provision, article 3540, applies in this case.  It provides in full as follows:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied on by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

La. Civ. Code art. 3540 (emphasis added).  Comment (e) provides in relevant part that:

> To be recognized under this Article, the contractual choice of law must be either express or implied.  It is express when it is literally declared in the contract; it is implied when, on the basis of the surrounding

7

> circumstances, especially the provisions of the contract or the conduct
> of the parties, it is evident that the parties have clearly relied upon the
> law of a particular state. . . .

Id., cmt. (e) (emphasis added).

It is clear that Bridger and Seneca impliedly relied upon Wyoming law in drafting the policy. The policy contains a Wyoming-specific endorsement labeled "WYOMING CHANGES" which alters the terms of the policy in conformity with Wyoming law. See Record Document 26, Ex. E-1 at 32. This endorsement makes several modifications to the policy, including deletions and additions to coverage terms and definitions. See id. The policy does not contain a similar endorsement for compliance with Louisiana's or any other state's laws. See id. Although the parties did not expressly declare that the policy is governed by Wyoming law, the court finds they clearly relied upon Wyoming law in drafting the policy.

Under article 3540, parties' contractual choices of law are given effect unless that state's law "contravenes the public policy of the state whose law would otherwise be applicable under Article 3537." La. Civ. Code art. 3540. Assuming, arguendo, that Louisiana's law would otherwise be applicable under Article 3537, Wyoming law still applies in this case because it does not contravene the public policy of

Louisiana.[5] Bridger does not assert, nor does the court find, any reason why Wyoming's contract laws would violate Louisiana's public policy.  Indeed, Bridger concedes that "the application of either state's laws would have the same effect." Record Document 27 at 9.  Therefore, the court will apply Wyoming law to the policy.

## C. Interpretation Of The Policy.

### 1.   Wyoming Contract Law In General.

Wyoming courts construe insurance policies according to the traditional rules of contract construction.  See Brown v. Royal Maccabees Life Ins. Co., 137 F.3d 1236, 1242 (10th Cir. 1998)(citing Doctors' Co. v. Ins. Corp., 864 P.2d 1018, 1023 (Wyo. 1993)).  The Wyoming Supreme Court summarized these rules as follows:

> [T]he parties have the right to employ whatever lawful terms they wish and the courts will not rewrite them. In other words, the terms must not conflict with pertinent statutes or public policy. Such [insurance] contracts should not be so strictly construed as to thwart the general object of the insurance. To this should be added the concept that the words used will be given their common and ordinary meaning. The intention of the parties is the primary consideration and is to be ascertained, if possible, from the language employed in the policy, viewed in the light of what the parties must reasonably have intended.

---

[5] The court finds it unnecessary to determine whether Louisiana's or Wyoming's law would apply under Article 3537.  However, this court will assume, without deciding, that Louisiana law would otherwise be applicable under Article 3537, for the limited purpose of determining if Wyoming law contravenes Louisiana public policy.

> Absent ambiguity, there is no room for construction and the policy will be enforced according to its terms. Neither will the language be "tortured" in order to create an ambiguity.

McKay v. Equitable Life Assur. Soc. of U.S., 421 P.2d 166, 168 (Wyo. 1966) (citations omitted).

A contract is ambiguous if it is "obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." State Farm Fire & Cas. Co. v. Paulson, 756 P.2d 764, 766 (Wyo. 1988). Whether a contract is ambiguous is a question of law appropriate for summary judgment. See Examination Mgmt. Servs., Inc. v. Kirschbaum, 927 P.2d 686, 689 (Wyo. 1996)(citing Prudential Preferred Props. v. J & J Ventures, Inc., 859 P.2d 1267, 1271 (Wyo. 1993); State v. Penzoil Co., 752 P.2d 975, 979 (Wyo. 1988)).  Likewise, the meaning of an unambiguous term or phrase in a contract may be resolved by summary judgment. See id.

### 2.    The Policy.

Determining whether coverage is due to Bridger under the policy requires a three-step analysis.  First, the court must determine whether Coverage A covers the damages suffered by Bridger.  If Coverage A applies, the court must next determine if the policy's pollution exclusion excludes coverage.  Finally, if coverage is excluded, the court must determine if coverage nevertheless is available by virtue of

the short-term pollution event exception to the pollution exclusion.

Coverage A of the policy applies to "BODILY INJURY AND PROPERTY DAMAGE LIABILITY." Record Document 26, Ex. E-1 at 15. Both parties agree that property damage, not bodily injury, is at stake in this dispute. Under Section 1(b), property damage is covered only if (1) the damage is caused by an "occurrence" that takes place in the "coverage territory"; (2) the damage occurs during the policy period; and (3) the insured did not know that the damage occurred prior to the policy period. See id. "Occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." See id.

The damages sustained by Bridger meet the policy's terms for coverage. Seneca does not dispute that property (the land and groundwater surrounding the pipeline) was damaged by an occurrence (the rupture), and that the rupture occurred within the coverage territory (near Robertson, Wyoming). Seneca further concedes that the spill occurred within the policy period (September 2009–September 2010), and does not allege that Bridger knew of the damage prior to the policy period. Accordingly, the court finds that Coverage A unambiguously applies to the rupture.

Having found that Coverage A applies to the damages sustained by Bridger, the court must now determine if coverage is excluded under the policy's pollution exclusion. Subsection 2(f), as modified by an endorsement attached to the policy,

provides that Coverage A does not apply to property damage "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants'. . . ." Record Document 26, Ex. E-1 at 33. "Pollutants" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, alkalis, chemicals and waste. Waste includes materials to be recycled reconditioned or reclaimed." Id., Ex. E-1 at 29.

Bridger argues that the exclusion is inapplicable because crude oil is not a "pollutant" since crude oil is not enumerated as such in the policy's definition.[6] It also notes the absence of Wyoming jurisprudence finding crude oil to be a "pollutant." Conversely, Seneca contends that a plain meaning construction of the word "pollutant" encompasses crude oil and cites to deposition testimony in which Bridger employees concede that the crude oil that spilled from the pipeline polluted the environment as proof that Bridger understood crude oil to be a "pollutant."

Bridger is correct that the Wyoming Supreme Court has not expressly found crude oil to be a "pollutant." However, its opinion in Gainsco Insurance Company v. Amoco Production Company, 53 P. 3d 1051 (Wyo. 2002), provides several guiding principles for interpreting pollution exclusions. The insurance policy in Gainsco

---

[6] Bridger does not contest that crude oil "discharged, dispersed, seeped, migrated, released or escaped."

contained a pollution exclusion identical to that at issue in this case.[7] The Wyoming Supreme Court first noted that words in an insurance contract should be given the plain meaning "that a person in the position of the insured would understand them to mean." Id. at 1066. Next, it suggested a useful test for determining whether a pollution exclusion applies: "Was the incident in this case an instance of pollution?" Id.

Applying these principles, the pollution exclusion applies in this case. First, a plain meaning construction of the words in the exclusion encompasses the release of crude oil into the environment. Reading the policy's definition of "pollutant," crude oil is obviously a "liquid." It also is a "contaminant" in the ordinary sense of

---

[7] The exclusion in Gainsco read:

This insurance does not apply to and no duty to defend is provided for:
1. "Bodily injury" or "property damage" which would not have occurred in whole or in part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time; or

. . .

Pollutants mean any solid, liquid, gaseous, bacterial or thermal irritant or contaminant including smoke, vapor, soot, fumes, acid, alkalis, chemicals and waste. Waste includes material to be recycled, reconditioned or reclaimed.

53 P.2d at 1057.

that word. "Contaminant" means "something that contaminates." Webster's Third New International Dictionary 1756 (4th ed. 1976). To "contaminate" means "to soil, stain, corrupt, or infect by contact or association." Id. When released into the environment, crude oil is clearly something that soils, stains, or corrupts the natural world. In this case, it is undisputed the oil that was released after the rupture soiled, stained, or corrupted the land and groundwater in Robertson, Wyoming. Thus, a plain reading of the words of the exclusions supports application of the policy.

Under Gainsco, the court should also consider how a person in the position of the insured would understands the terms. Gainsco, 53 P.3d at 1057. Here, a person in the position of the insured, Bridger, understands that crude oil is a "pollutant." At the corporate deposition of Bridger, Karen Courtman, Bridger's "Administrator", conceded that the crude oil contaminated the environment:

Q:   And you would agree with me that the oil that was released from the Bridger Lake pipeline in April of 2010 contaminated the environment?

A:   Yes.

Q:   And it contaminated the land?

A:   Yes.

Q:   And it contaminated the groundwater?

A:   Yes.

Record Document 26, Ex. A at 30-31. This testimony unequivocally shows that Bridger understood the words "pollutant" and "contaminant" to include the escape of crude oil into the environment.

The court reaches the same conclusion by asking "Was the incident in this case an instance of pollution?" Gainsco, 53 P.3d at 1066. Without a doubt, the incident in this case is an instance of pollution. The land and groundwater near the pipeline were polluted as a result of the rupture. Approximately 4,000 barrels of crude oil were released and spread 2,500 feet from the rupture site. See Record Document 26, Ex, A at 35. Accordingly, under a plain meaning construction, the pollution exclusion applies in this case.

As noted above, words in a contract should not be interpreted so as to thwart the contract's purpose. See McKay, 421 P.2d at 168 (Wyo. 1966)(citations omitted). The Gainsco court explained the purpose of a pollution exclusion in insurance policies:

> The pollution exclusion had its inception in the 1970's in response to federal and state legislation mandating responsibility for the cleanup costs of environmental pollution. 9 Couch on Insurance 3d § 127:3 (1997). The purpose of the current version of the exclusion remains to exclude these governmentally mandated cleanup costs.

Gainsco, 53 P.3d at 1066. In this case, Bridger's attempt to recover governmentally

15

mandated cleanup costs from its insurer contravenes the purpose of the pollution

exclusion, which is to impose the burden of cleanup on the polluter.  Accordingly,

Seneca's interpretation is preferable because it is consistent with the purpose of the

exclusion.

Because the pollution exclusion applies, no coverage is due to Bridger unless

the short-term pollution exclusion applies.  The short-term pollution exclusion is

contained within the endorsement mentioned above.  Beginning on page thirty-three

of the policy, it provides: "This endorsement changes the policy.  Please read

carefully."  Record Document 27, Ex. E-1 at 35.  Then, in larger type-face, it is titled

"POLLUTION EXCLUSION - LIMITED EXCEPTION FOR A SHORT-TERM

POLLUTION EVENT."  Id.  Under the terms of the exception, the pollution

exclusion does not apply to:

> (iv) "Bodily injury" or "property damage" arising out of a "short-term
> pollution event" provided you notify us of the short-term pollution event
> as soon as practicable, but no more than fourteen (14) days after its
> ending.

Id.  A "short-term pollution event" is defined as a "discharge, dispersal, release or

escape of pollutants which:"

> a. Begins during the policy period;

> b. Begins at an identified time and place;

c. Ends, in its entirety, at an identified time within forty-eight (48) hours of the beginning of the discharge, dispersal, release or escape of the "pollutants";

d. Is not a repeat or resumption of a previous discharge, dispersal, release or escape of the same pollutant from essentially the same source within twelve (12) months of a previous discharge, dispersal, release or escape;

e. Does not originate from an "underground storage tank"; and

f. Is not heat, smoke or fumes from a "hostile fire".

Id., Ex. E-1 at 36.  An unenumerated paragraph provides additional requirements for

a "short-term pollution event":

To be a "short-term pollution event", the discharge, dispersal, release or escape of "pollutants" need not be continuous. However, if the discharge, dispersal, release or escape is not continuous, then all discharges, dispersals, releases or escapes of the same "pollutants" from essentially the same source, considered together, must satisfy Provisions a. through f. of this definition to be considered a "short-term pollution event."

Id.

Before addressing the parties' disagreements over these provisions, it is

important to "check off" where the parties agree.  Subparagraphs (a), (b), (e) and (f)

are not in dispute.  The parties agree that the rupture began during the policy period,

which ran from September 2009 through September 2010, and that the rupture began

at an identified time and place, around mile 16.5 of the pipeline on the morning of

April 1, 2010.  See Record Document 27, Ex. B at 82.  They also agree that the discharge did not originate from an underground storage tank and that the discharge is not heat, smoke or fumes from a hostile fire.

The parties diverge over interpretation of subpart (c) and the last paragraph of this exception.  The gravamen of Bridger's interpretation of the last paragraph is that the crude oil released on April 1, 2010, should be not be considered together with that released on the 2nd, 3rd 4th and 5th.  Bridger defines "same" as "the very thing just mentioned" and "source" to mean "a generative force."  Record Document 27 at 16, Record Document 32 at 12.  Bridger argues that, since all of the oil above the break in the pipeline escaped on April 1st, the additional crude injected on April 2nd through 5th is not the very same "pollutant" that escaped on April 1st.  It further contends that the damages did not arise from the same source because the source of Bridger's damages on April 1, 2010, was the rupture while the additional damages came from the addition of crude into the pipeline on April 2nd through 5th.  Thus, under Bridger's interpretation, coverage is available under the exception if the April 1, 2010, release is considered in isolation, given that all of the crude oil in the pipeline on that date escaped within forty-eight hours of the rupture.

Seneca argues that the words of the exceptions are unambiguous and should be given their common, ordinary meaning.  The exception does not apply under

Seneca's interpretation because all of the crude oil originated from the same source–Whiting–and the pollution event did not end within 48 hours after it began.

After thoroughly reviewing the policy, the court finds that the language of the pollution exception is not ambiguous. The words "same" and "source" are plain, clear, and susceptible of only one meaning. Bridger strains to articulate how defining these words could yield ambiguous results in the abstract: "[f]or example, all crude comes from 'essentially the same source' in that it is extracted from the ground. This, however, could not have been what Seneca intended. . . ." Record Document 27 at 16. However, as Seneca points out, it is not enough that words in a contract are ambiguous in the abstract; the words must be ambiguous when applied to the facts. See Hartford Acc. & Indem. Co. v. U.S. Fid. & Guar. Co., 962 F.2d 1484, 1489 (10th Cir. 1992) (citation omitted) ("[B]y their very nature, dictionaries define words in the abstract, whereas here, we must ascertain whether the word 'sudden' is ambiguous in the context of a specific insurance policy."). These words are  not obscure, indefinite, or susceptible of double meanings as in the context of the policy at issue in this case. See Paulson, 756 P.2d at 766.

Bridger is correct that "same" and "source" are not further defined in the policy. However, the policy does not define many other common and ordinary terms, and the mere fact that a term is undefined does not alone render the term ambiguous.

19

See id. at 768.  "Same" is ordinarily and commonly thought of as "identical" or "equal to" and "source" is most commonly defined as "point of origin."  Webster's Third New International Dictionary 2007, 2177 (4th ed. 1976).

Under a plain meaning interpretation, all of the releases must be considered together.  First, the only substance in the pipeline from April 1st through April 5th was crude oil.  Therefore, the crude oil represents the "same pollutants" because the substances are identical.  Second, all 4,000 barrels of crude oil were produced and pumped into the pipeline by Whiting.  It follows that the crude oil was derived from the same point of origin.[8]  As a result, an ordinary meaning interpretation of these words is that the "same pollutants," crude oil, came from the same "source," Whiting.  No other plausible interpretation exists, and Bridger would have the court torture the policy language to create ambiguity where none exists.  See McKay, 421 P.2d at 168.  Accordingly, under the policy's clear terms, the releases must be considered together.  Taken as a whole, the discharges began on April 1st and ended on April 5th, well over forty-eight hours after they began.  Therefore, subpart (c) of the exception is not satisfied, and the limited short-term pollution exception does not apply.

Finally, Bridger argues that applying the pollution exclusion coverage renders

---

[8] The same result is reached even if one considers the rupture site to be the "source" of the pollutants given that all of the crude oil released on April 1st through 5th escaped through a single rupture point at mile 16.5.

coverage "illusory" because the pollution exclusion "could exclude any property damage resulting from the crude oil in the pipeline." Record Document 27 at 17. Coverage is illusory when the insurer accepts premiums from its insured although "it realistically is not incurring any risk of liability." Pompa v. Am. Family Mut. Ins. Co., 520 F.3d 1139, 1145 (10th Cir. 2008). As Seneca points out, the policy covers a wide range of non-pollution related occurrences, such as "bodily injury; property damage; medical payments; personal and advertising injury; and products-completed operations hazards." Record Document 26, Ex. E-1. Reviewing the policy, it is obvious that Seneca incurs many risks of liability as Bridger's insurer.

Moreover, by virtue of the short-term pollution exception, the policy even insures against pollution-related losses in some circumstances. This court need not hypothecate all the scenarios for which coverage for pollution occurrences exists under the policy. However, one illustration is particularly prudent in this instance. The policy likely would have covered Bridger's losses if, rather than taking five days to notify Whiting of the rupture, Bridger had more promptly discovered the problem and notified Whiting on April 2nd or April 3rd. Assuming Whiting stopped pumping oil through the pipeline as soon as it received the notice (as it did in reality), the pollution event may well have ended forty-eight hours or less after it began. In such a scenario, coverage would likely be available under the policy. For these reasons,

21

Bridger's final argument lacks merit.

**C.    Seneca's Motion For Summary Judgment.**

Having found that Bridger's damages are excluded under the pollution exclusion and not excepted by the short-term pollution provision, no coverage is due to Bridger under the unambiguous terms of the policy.  Thus, Seneca's motion for summary judgment is **GRANTED** and Bridger's claim for coverage under the policy is **DISMISSED WITH PREJUDICE**.

Seneca's motion also seeks dismissal of Bridger's claim for bad faith penalties.[9]  Seneca contends that there is no evidence that it acted in bad faith in adjusting Bridger's claim and also that Bridger failed to submit adequate proof of loss.

Under Wyoming law, claims for benefits under a property or casualty insurance policy "shall be rejected or accepted and paid by the insurer or its agent designated to receive those claims within forty-five (45) days after receipt of the claim and supporting bills." W.S. § 26-15-124(b).  An insurer is liable for interest and attorney's fees if it "refuses to pay the full amount of a loss <u>covered by the policy</u> and the refusal is unreasonable or without cause." W.S. § 26-15-124(c) (emphasis added). Wyoming

---

[9] The court notes that Bridger's claim sought penalties for bad faith under Louisiana law.  Because this court determined that Wyoming law governs, it will analyze Bridger's claim under Wyoming law.

courts apply an objective standard to determine whether an insurer has acted in bad faith. See Kirkwood v. CUNA Mut. Ins. Soc., 937 P.2d 206, 211 (Wyo. 1997). Under the objective standard, "[t]he appropriate standard of care to apply . . . is whether the validity of the denied claim was fairly debatable." First Wyo. Bank, N.A., Jackson Hole v. Cont'l Ins. Co., 860 P.2d 1094, 1101 (Wyo. 1993) (citations omitted).

Because this court has determined that Bridger's loss is not covered by the policy, Seneca's refusal to pay is not unreasonable or without cause. Seneca's refusal to tender the remaining $900,000 under the policy was based on its justifiable belief that Bridger's losses were excluded under the pollution exclusion. Even had Bridger's shown its losses were covered, Bridger has not shown that its claim was so clearly covered by the policy that the claim was not "fairly debatable."

Seneca has met its burden under Rule 56 of establishing the absence of a genuine dispute of material fact with respect to Bridger's bad faith claim. Bridger, on the other hand, has not presented any evidence that Seneca acted unreasonably or without cause in failing to pay its claim beyond a conclusory allegation that Seneca had "all the information it needed to make a coverage determination." Record Document 32 at 13. Such conclusory allegations are insufficient to overcome the nonmovant's burden on a motion for summary judgment. See Ramsey, 286 F.3d at

23

269.    Accordingly, Seneca's motion for summary judgment is **GRANTED** as to

Bridger's claim for bad faith damages against Seneca.

**D.    Bridger's Motion For Partial Summary Judgment.**

Bridger's motion for partial summary judgment seeks a determination by the

court that it is entitled to coverage under the policy because the rupture qualifies as

a "short-term pollution event." As the plaintiff, Bridger must present evidence which

would entitle it to a directed verdict if the evidence went uncontroverted at trial in

order to prevail on its motion for partial summary judgment. See Int'l Shortstop, Inc.

v. Rally's, Inc., 939 F.2d 1257, 1264 (5th Cir. 1991); Nat. Union Fire Ins. v. Hibernia

Nat. Bank, 258 F.Supp.2d 490, 492 (W.D. La. 2003).[10]  Thus, under this standard,

Bridger must show that no reasonable jury would find that the rupture was excluded

under the policy.

Given that this court has found as a matter of law that the rupture does not

qualify as a short-term pollution event, Bridger has failed to show that no reasonable

jury would so find.  Accordingly, its motion for summary judgment is **DENIED**.

---

[10] A directed verdict is proper pursuant to Rule 50 of the Federal Rules of
Civil Procedure in favor of one party where the opposing party has been fully
heard on an issue and the court determines that a reasonable jury would not have a
legally sufficient evidentiary basis to find for the party on that issue. See Fed. R.
Civ. P. 50.

**E.      Seneca's Motion To Strike.**

Seneca's motion urges the court to strike two expert reports submitted by Bridger in support of its motion for summary judgment.  The first report calculates that it took approximately two hours for the 2,754 barrels of oil in the pipeline to escape on April 1, 2010. See Record Document 27, Ex. C.  The second report shows that Bridger expended more than its $1,000,000 policy limit to remediate the 2,754 barrels released on April 1, 2010.  See id., Ex. F.  Seneca argues the reports are inadmissible under Federal Rule of Evidence Rule 702 and because the experts have not yet been deposed.

These reports are only relevant if the coverage exists under the policy.  Because this court found otherwise, it did not consider these expert reports.  Therefore, Seneca's motion to strike is **DENIED AS MOOT.**

## III. CONCLUSION

Based on the foregoing, Seneca's motion for summary judgment is **GRANTED** and all of Bridger's claims against Seneca are **DISMISSED WITH PREJUDICE.**

Bridger's motion for partial summary judgment is **DENIED.**

Seneca's motion to strike is **DENIED AS MOOT.**  An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana this __6__ day of June,

2013.

_____
JUDGE TOM STAGG